UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**LOUIS MORTON LEACH**<br>**PATRICIA KATHERINE LEACH** ,<br><br>Debtors. | Case No. **08-61028-13** |

## MEMORANDUM OF DECISION

At Butte in said District this 26th day of February, 2009.

The confirmation of the Debtors' amended Chapter 13 Plan is pending to which the Trustee objects on the grounds the Debtors deducted the cost basis of two motor vehicles, which they sold within 6 months before the date they filed their bankruptcy petition, from the sale proceeds in calculating their current monthly income ("CMI") under 11 U.S.C. § 101(10A) and disposable income under 11 U.S.C. § 1325(b). After a hearing the Court granted the parties time to file briefs, which were filed on November 3, 2008 and which have been reviewed by the Court together with the record and applicable law. The matter is ready for decision. For the reasons stated below the Trustee's objection is sustained in part and overruled in part, and confirmation the Debtors' amended Plan will be denied by separate Order.

This Court has jurisdiction in this Chapter 13 case under 28 U.S.C. § 1334(a). Confirmation of Debtors' Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L). This Memorandum of Decision includes the Court's findings of fact and conclusions of law. At issue is whether debtors may deduct the cost basis from the proceeds of the sale of debtors' vehicles

when calculating their CMI under § 101(10A).  The Court concludes that the deduction of the cost basis from the proceeds of the sale of Debtors' vehicles is unnecessary as the proceeds from the sale of the 1999 Hyundai and 1996 Neon are not income for purposes of computing CMI.

The hearing on confirmation was held after due notice at Great Falls on October 24, 2008, with the Debtors represented by attorney D. Randy Winner of Great Falls and Debtor Louis Morton Leach ("Louis") testifying.  The Chapter 13 Standing Trustee Robert G. Drummond appeared.  No exhibits were admitted.

## FACTS

The material facts are uncontroverted.  Louis and Patricia Leach ("Patricia") (together "Leaches" or "Debtors") are married.  Louis is employed at Great Falls Cardiology as a cardiovascular technologist.  Patricia is employed as a waitress at the Best Western Heritage Inn in Great Falls for wages and tips.  Louis testified that they had no income from any other source than wages and tips in the six-month period prior to the filing of their bankruptcy petition, and that he has never been in the business of buying and selling motor vehicles.  Louis and Patricia share joint checking and savings accounts at Family First Federal Credit Union ("Family First FCU").

Louis testified that on June 27, 2008, he sold his 1999 Hyundai Elantra ("Hyundai"), which he had purchased for $6,000 five years ago and paid for in full[1], for the sum of $2,000 in cash.  Also, on June 27, 2008, Patricia sold her 1996 Dodge Neon ("Neon"), which she had purchased for approximately $4,500 before Louis met her and which she had paid for in full, for

---

[1] Louis testified that he had made some expenditures on his Hyundai for repairs, but did not say how much he spent.

$1,200 in cash. Louis testified that they made no payments on either his Hyundai or Patricia's Neon during the 6 months prior to the filing of their bankruptcy petition. Louis testified that they deposited the total $3,200 in proceeds from the sale of the 2 vehicles in their Family First FCU account, which had a small amount of wages on deposit[2].

Also on June 27, 2008, Patricia and Louis each purchased a motor vehicle. Patricia purchased a 2004 Pontiac, for which she made a down payment in the sum of $2,000 on a check written on their Family First FCU account. Louis purchased a 2002 Jeep Liberty and made a down payment in the amount of $2,700 by check written on their account. The total amount of the two down payments exceeded the $3,200 in proceeds from the sale of the Hyundai and Neon, and Louis testified that they paid the difference from their income[3].

Leaches filed a joint Chapter 13 petition on July 31, 2008, with their Schedules, Statement of Financial Affairs ("SOFA"), Form B22C, and Chapter 13 Plan. Schedule B lists their Family First FCU savings and checking accounts with a total amount on deposit of $226. Their original Form B22C listed their monthly disposable income at line 59 in the amount of $539.00. Their SOFA at question 10, "Other transfers" lists the sale in June 2008 of Patricia's Neon for $1,200, with the proceeds used as down payment for a 2004 Pontiac, and the sale of Louis' Hyundai for $2,000 with the proceeds used as down payment for a 2002 Jeep Liberty.

---

[2]Louis testified that all of the Debtors' income and expenses go through their Family First FCU accounts.

[3]On cross examination Louis testified that he did not attempt to trace the proceeds from the sale of the two vehicles to the purchase of the Pontiac and Jeep. However, he also testified that all of the sale proceeds went into his account, and that they wrote the checks for the down payments on the Pontiac and Jeep on the same day they deposited the proceeds. In Debtors' brief they allege that both purchases were financed after they made the down payments.

Debtors' original Plan proposed payments in the sum of $798 for 60 months. The Trustee filed objections to confirmation, including that Debtors omitted income from the sale of the Hyundai and Neon. After the Trustee objected, the Debtors filed amended Schedules I and J and Form B22C on September 18, 2008. The amended Schedule J includes an attachment stating the installment payment for the 2004 Pontiac as $295 per month, and for the 2002 Jeep as $257.00 per month.

At line 9 their amended Form B22C added income from the sale of the Hyundai in the amount of $333.00, with a parenthetical on line 9a "($2000 total)", and income from the sale of the Neon in the amount of $200.00 with a parenthetical on line 9b "($1200 total)"[4]. Lines 20 and 53 list Debtors' CMI in the amount of $9,485.00. Lines 47c and 47d list the installment payments to Credit Acceptance for the 2004 Pontiac in the amount of $208.75, and $146.25 for the 2002 Jeep Liberty[5]. After deducting $8,277.00 and $54.00 in qualified retirement deductions for a total of $8,331.00 in total adjustments, Debtors entered "-$579.00" at Line 59 as their monthly disposable income. At Part VI, lines 60a and 60b, "Other Expenses," the Debtors entered $1,000.00 as a monthly expense for the Hyundai and $733.00 for the Neon as additional

---

[4] The instructions at Part I, line 1, of the amended Form B22C explains: "All figures must reflect average monthly income received from all sources, derived during the six months prior to filing the bankruptcy case, ending on the last day of the month before the filing. If the amount of monthly income varied during the six months, you must divide the six-month total by six, and enter the result on the appropriate line." Following this direction the Debtors entered $333.00 at line 9a for the sale of the Hyundai ($2,000 divided by 6 = $333.34), and $200.00 at line 9b for the sale of the Neon ($1,200 divided by 6 = $200).

[5] Louis could not explain the discrepancy in the amounts of the installment payments for the vehicles on Schedule J compared with their amended Form B22C on lines 47c and 47d. He testified that he and Patricia did not perform the calculations on line 47.

expense claims[6], a total of $1,733.00. Louis admitted that line 60 is not an expense over the term of their Plan.

Debtors filed an amended Chapter 13 Plan on October 15, 2008, proposing 60 monthly payments in the amount of $860, including payment of unimpaired secured claims secured by Debtors' Pontiac and Jeep. Louis testified on redirect examination by their attorney that neither he nor Patricia calculated their plan payment, and that any problem with the payment arises from their attorney or his bankruptcy software.

The Trustee filed objections to the amended Plan, after which Debtor filed another amended Plan on October 23, 2008 (Docket No. 23). At the confirmation hearing the Trustee advised the Court that his first objection based on the claim of Beneficial Home Mortgage was cured, but he continues to object to Debtors' deduction of $1,733.00 representing the basis of their 2 sold vehicles as a "tax concept," based on the definition of CMI at 11 U.S.C. § 101(10A) and the decision of the Ninth Circuit Bankruptcy Appellate Panel ("BAP") in *In re Wiegand*, 386 B.R. 238 (9th Cir. BAP 2008).

Debtors' memorandum contends that the sale of their two vehicles did not represent income generating events, that the sales were between private parties in a non-commercial venue, and that the proceeds were immediately rolled over into their two newer vehicles.

**DISCUSSION**

It is well established law in this Circuit that for a bankruptcy court to confirm a plan, "each of the requirements of section 1325 must be present and the debtor has the burden of

---

[6] The $6,000 cost basis for the Hyundai and the $4,400 cost basis for the Neon are included in parentheses next to the respective vehicles on lines 60a and 60b. Dividing those numbers by six equals monthly amounts of $1,000 and $733.34, respectively.

proving that each element has been met." *In re Barnes*, 32 F.3d 405, 407 (9th Cir. 1994); *In re Andrews*, 49 F.3d 1404, 1408 (9th Cir. 1995); *In re Tuss*, 360 B.R. 684, 690 (Bankr. D. Mont. 2007); *In re Tranmer*, 355 B.R. 234, 241 (Bankr. D. Mont. 2006). Section 1325(a)(1) requires confirmation of a plan if "the plan complies with the provisions of this chapter and with the other applicable provisions of this title." Therefore, the Debtors have the burden of proof on all elements of confirmation. *Meyer v. Hill (In re Hill)*, 268 B.R. 548, 552 (9th Cir. BAP 2001).

The Trustee bases his objection to confirmation on the "disposable income" test under § 1325(b)(1)(B) which provides:

> (b)(1) If the trustee . . . objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –
>
> * * * *
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

*Tuss*, 360 B.R. at 690; *Tranmer*, 355 B.R. at 241. The Ninth Circuit recently explained: "If a trustee or holder of an allowed unsecured claim objects to the confirmation of a plan that does not propose to pay unsecured claims in full, the court may confirm the plan only if the plan provides that all of the debtor's 'projected disposable income' received during the 'applicable commitment period'[7] is applied to make payments under the plan. 11 U.S.C. § 1325(b)(1)." *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868, 872 (9th Cir. 2008).

The Trustee objects and asks that the Court deny confirmation of Debtors' Plan because they deducted the cost bases of their Hyundai and Neon in calculating their disposable income.

---

[7]The applicable commitment period is not at issue in the instant case.

6

Debtors argue that they followed the *Wiegand* decision when they deducted their cost bases for the two sold vehicles on line 60 of their Form B22C.

"Disposable income," as defined at § 1325(b)(2), was significantly changed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. 109-8) ("BAPCPA"). *Kagenveama*, 541 F.3d at 873 n.2. Section 1325(b)(2) now provides, in pertinent part:

> For purposes of this subsection, "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended —
>
> (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
>
> (ii) for charitable contributions (that meet the definition of "Charitable contribution" under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

*Tuss*, 360 B.R. at 691; *Tranmer*, 355 B.R. at 241-42.

This Court applies a mechanical test in which its discretion to determine the reasonableness of a debtor's expenses in calculating disposable income has been curtailed by BAPCPA. *Tranmer*, 355 B.R. at 243-44, 246; *Tuss*, 360 B.R. at 691-92, 695.

In *Kagenveama* the Ninth Circuit rejected case authority which held that "projected disposable income" is not related to "disposable income" as articulated in *In re Hardacre*, 338

B.R. 718, 722 (Bankr. N.D. Tex. 2006), "because the plain language of § 1325(b) links 'disposable income' to 'projected disposable income,' and we are bound by the definition of 'disposable income' provided in § 1325(b)(2)(B)." *Kagenveama,* 541 F.3d at 874 . The Ninth Circuit wrote that the line of authority in *In re Pak*, 378 B.R. 257, 263, 268 (9th Cir. BAP 2007) and *In re Jass*, 340 B.R. 411, 415 (Bankr. D. Utah 2006),

> is unpersuasive because no text in the Bankruptcy Code creates a presumptively correct definition of "disposable income" subject to modification based on anticipated changes in income or expenses. In fact, the textual changes enacted by BAPCPA compel the opposite conclusion. The revised "disposable income" test uses a formula to determine what expenses are reasonably necessary. *See* 11 U.S.C. § 1325(b)(2)-(3). This approach represents a deliberate departure from the old "disposable income" calculation, which was bound up with the facts and circumstances of the debtor's financial affairs. *In re Winokur*, 364 B.R. 204, 206 (Bankr. E.D. Va. 2007); *In re Farrar-Johnson*, 353 B.R. 224, 231 (Bankr. N.D. Ill. 2006) (stating that "[e]liminating flexibility was the point: the obligations of [C]hapter 13 debtors would be subject to clear, defined standards, no longer left to the whim of a judicial proceeding") (internal quotations omitted).
>
> * * * *
>
> We decline to follow the line of cases holding that Form B22C creates a presumptively correct definition of "disposable income."

*Kagenveama*, 541 F.3d at 874-75.

The Ninth Circuit's amended decision in *Kagenveama* was entered on June 23[8], 2008, almost three months after the BAP decided *Wiegand* on April 3, 2008. The BAP in *Wiegand* found that Official Form 22C is "directly at odds with" § 1325(b)(2)(B) in providing in Part I for a self-employed chapter 13 debtor to deduct business expenses from gross receipts to arrive at CMI under § 101(10A), and that Form 22C ought to be changed to comply with the statute. *Id.*, 386 B.R. at 241, 243. The Ninth Circuit decision in *Kagenveama* makes no reference to

---

[8] The decision was originally filed on June 5, 2008.

8

*Wiegand*'s conclusion that Form 22C conflicts with § 1325(b)(2)(B), but notes at footnote 1: "Rule 1007(b)(6) of the Federal Rules of Bankruptcy Procedure requires a debtor to file a statement of current monthly income on Form B22C." 541 F.3d at 872 n. 1,

This Court's decision, *In re Kaufman*, 2008 WL 3878005, *4 (Bankr. D. Mont. 2008) cited *Kagenveama* for the position that for above median income debtors, reasonably necessary expenses are calculated using the "Means Test" of § 707(b)(2)(A) and (B). No question exists that Debtors in the instant case are above median income, and like *Tuss* and *Tranmer* the instant case does not present issues involving changes in future income or expenses, and so pursuant to § 1325(b)(3) the expenses of the Debtors must be determined under the "Means Test" of § 707(b)(2)(A) and (B). *Tranmer,* 355 B.R. at 245-46; *Tuss*, 360 B.R. at 691, 695.

The Trustee's position in this case is an extension of his objection in *Wiegand* and other cases, including *In re Featherston*, Case No. 07-60296 (Bankr. D. Mont.), where the Trustee objected that debtors may not deduct expenses from their business income under § 101(10A) and 1325(b) in calculating CMI because those statutes do not provide for such deduction and debtors are bound by the statutory language. The Trustee extends his objection in the instant case that the Debtors, who are not in the business of selling cars, may not deduct their cost basis from the sale proceeds of their personal vehicles under § 707(b) and must include all of the sale proceeds in calculating CMI.

"Current monthly income" is defined at 11 U.S.C. § 101(10A):

The term "current monthly income" –

>  (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable

9

>income, derived during the 6-month period ending on –
>
>>(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
>
>>(ii) the date on which current income is determined by the court for purposes of this title if the debtor foes not file the schedule of current income required by section 521(a)(1)(B)(ii); and
>
>(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

The Trustee cites *Tuss* and *Featherston* that all of the $3,200 sale proceeds from the 2 vehicles must be included in Debtors' income under the formula approach, as they did in Form B22C, but argues that they may not deduct the cost basis for the 2 sold vehicles in Part VI, line 60, of Form B22C because they did not spend any of those costs in the six-month period before they filed their petition or afterwards, and therefore the basis is not authorized as an expense under § 707(b) or § 1325(b).  The Court agrees with and sustains the Trustee's objection that the Debtors' cost bases may not be deducted at Part VI, line 60 ("Other Expenses"), because those must qualify, according to the instructions at line 60, as additional deductions under § 707(b)(2)(A)(ii)(I) under the Internal Revenue Service's National or Local Standards, or Other Necessary Expenses under that subsection, and the facts are clear that the Debtors' cost bases are

10

not ongoing postpetition expenses but rather were incurred prepetition on a single date. However, that does not end the analysis.

The Trustee argues that the BAP's decision in *Wiegand* controls that Tax Code concepts are inapplicable in determining CMI, because Congress did not reference the IRS standards or Tax Code concepts in § 101(10A) as it did in § 707(b). Debtors argue that the Tax Code provides decades of guidance regarding "income" and this Court "should not set about re-inventing the wheel." Debtors argue that *Wiegand* does not stand for the proposition that the Court should ignore the Tax Code, and that the Trustee errs in asserting that Debtors should not be allowed to deduct their bases from the sale proceeds since a hypothetical car dealer is allowed to deduct business expenses at line 60.

The above arguments by the Trustee and the Debtors have been resolved by the Ninth Circuit Court of Appeals in *Blausey v. U.S. Trustee*, 552 F.3d 1124, 1133 (9th Cir. 2009). "The phrase 'without regard to whether such income is taxable income' in 11 U.S.C. 101(10)(A)(A) reflects Congress' judgment that the Internal Revenue Code's method of determining taxable income does not apply to the Bankruptcy Code's calculation of CMI." *Id.* at 1132. In *Blausey*, the court further stated, "Moreover, where Congress wishes to define a term in the Bankruptcy code by reference to the Internal Revenue Code, it clearly knows how to do so. For example, Congress imported the Internal Revenue Service's Local and National Standards for expenses into the means test calculation. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I)." *Id.* at 1132-33.

The BAP held in *Wiegand*:

> We hold that a chapter 13 debtor engaged in business may not deduct ordinary and necessary business expenses from gross receipts for the purpose of calculating current monthly income under § 101(10A). Rather, such deductions

11

>are authorized under § 1325(b)(2)(B) and, therefore, are to be subtracted from current monthly income when calculating disposable income pursuant to § 1325(b)(2).

*Wiegand*, 386 B.R. at 239. Later, explaining its reasoning the BAP explained:

>To determine when a chapter 13 debtor should take business deductions, we start with the plain meaning rule and examine the statutory language in §§ 101(10A) and 1325(b)(2). If the statutory language is clear, we must apply it by its terms unless to do so would lead to absurd results. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241-42, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). We also engage in statutory interpretation by taking a holistic approach that strives to implement the policies behind the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA" and harmonize the provisions of the Code. *See Hough v. Fry (In re Hough)*, 239 B.R. 412, 414 (9th Cir. BAP 1999) (noting that we not only look at the language of the statute itself, but also to "the specific context in which that language is used, and the broader context of the statute as a whole") (citation omitted).

*Wiegand*, 386 B.R. at 241.

The Trustee argues that Debtors overreach by deducting the entire purchase price of the Hyundai and Neon. The Trustee argues that Debtors mingled the income from the sale of the Hyundai and Neon and used it to purchase the new vehicles and pay their living expenses. However, no evidence exists in the record to support the Trustee's argument that they used the proceeds to pay living expenses. The two new vehicles were purchased by a check written the same date they deposited the proceeds from the sale, June 27, 2008, and the total down payments for the purchase of the new cars were $4,700 according to Louis' uncontroverted testimony, which is more than the $3,200 in total proceeds from the sale of the Hyundai and Neon.

The Trustee contends that in *Featherston* the Court required the debtors to include prepetition income from the sale of cattle in calculating their CMI, and denied the debtors' attempt to offset the prepetition income because it would not occur in the future. The contention

has been resolved by *Kagenveama*, wherein the Circuit Court panel rejected the "forward-looking" concept followed in *Pak*.

The issue is: what is "income?" "Income" is not defined in the Bankruptcy Code. *Blausey*, 552 F.3d at 1132. The BAP in *Wiegand,* in the absence of a Code definition, decided that CMI must be gross receipts, without deduction of business expenses. *Weigand*, 386 B.R. at 242. That holding is inapplicable to the facts of the instant case because the Debtors are not in business.

The BAP in *Wiegand* reasoned that the specificity of § 1325(b)(2)(B) in allowing expenditures necessary for the operation of a business, and the absence of such language from § 101(10A), means that Congress did not intend to allow business deductions in calculating CMI and that Form 22C ought to be changed to omit allowing ordinary and necessary business expenses at line 3b[9]. That reasoning does not apply to the instant case because the Debtors are not in business and the cost bases of the sold vehicles were not shown by the evidence to involve operating expenses of a business, profession or farm.

In fact the dispute in *Wiegand* involved line 3 of Form 22C, "Income from the operation of a business, profession, or farm" while the instant case involves the Debtors' entries at line 9, "Income from all other sources." Line 9 does not include a provision like line 3b calling for deduction of expenses, which the BAP found in conflict with § 1325(b)(2)(B) in *Wiegand*. In

---

[9]A recent article from the Executive Office for U.S. Trustees noted that: "With respect to chapter 13 debtors who are at or below the median income, the need to avoid the double deduction of ordinary business expenses applies equally. The chapter 13 trustee is well-positioned to object if an above- or below-median income debtor claims a double deduction for any category of expenses." Mark A. Redmiles and Saleela Knanum Salahuddin, *The Net Effect,* American Bankruptcy Institute Journal, October 2008, 16, 56-57.

addition the Court notes that line 9 calls for "Income" in contrast to line 2 "Gross wages . . ." and line 3a "Gross receipts". If, as the Trustee argues, *Wiegand* requires gross sales proceeds to be entered at line 9 of Form 22C, then line 9 should call for "Gross income from all other sources" but it does not. Instead line 9 calls for "Income from all other sources," which is consistent with the requirement that all income from all sources be used in calculating CMI. According to Black's Law Dictionary 778 (8th ed. 2004), "income" is defined as "[t]he money or other form of payment that one receives, [usually] periodically, from employment, business, investments, royalties, gifts, and the like[10]." The items included in Black's definition on income involve income generation or income substitutes. As defined by Webster's Third New International Dictionary 1143 (1993), the definitions of income may also include "a gain," derived from the sale of property.

The instant case does not involve Debtors engaged in selling vehicles "generating significant revenues through a business" like in *Weigand*. The Leaches simply sold their personal vehicles and used the proceeds to purchase replacement vehicles, from which the Trustee argues the gross sale proceeds from the sale of the two vehicles must be included in "current monthly income" since the sale occurred within 6 months of the date of the filing of the petition.

As stated above, the reasoning of *Wiegand* does not apply because the Leaches were not

---

[10]Under the doctrine of *ejusdem generis*, "where an enumeration of specific things is followed by some more general word or phrase, such general phrase is to be held to refer to things of the same kind as those enumerated." *Aleksich v. Industrial Accident Fund*, 116 Mont. 127, 151 P.2d 1016 (1944). Black's Law Dictionary (8th ed. 2004) defines *ejusdem generis* as "[a] canon of construction that when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed."

engaged in the business of selling cars, and therefore incurred no business expenses which could be deducted under § 1325(b)(2)(B).

As noted the issue involves what is "income." In *Blausey*, the panel concluded that debtors' argument that private disability insurance benefit payments are not income under the dictionary definitions was unavailing. The "benefits were triggered when [debtor's] lost earnings exceeded twenty percent of her original monthly earnings. The monthly benefits payment under the policy is based on the amount of income lost. . . . It is thus clear that the purpose of the disability insurance plan is to replace the income that [debtor] lost due to her disability." *Blausey*, 552 F.3d at 1133. According to the facts in *Blausey*, the private disability insurance policy, which premiums are paid by debtor, not her employer, pays benefits up to a specified "monthly income benefit amount" if debtor is unable to work and she encounters a loss of monthly earnings of 20 percent or more. *Id.* at 1127. Monthly earnings are defined in the policy as "wages, salaries, commissions, fees, and deferred income." *Id*. For approximately 10 years prior to filing bankruptcy, debtor had been receiving $4,000 per month in disability benefit payments under her policy. *Id.*

As noted the panel had little difficulty finding that the disability benefit payments constituted income includible in CMI as a replacement for income that debtor lost due to her disability. *See id.* at 1133. This conclusion by the panel also was based on the following reasoning:

> Finally, the history of BAPCPA indicates that excluding Mrs. Blausey's disability insurance benefits from CMI would contravene the purpose of the means test. According to the House Report on BAPCPA, "[t]he heart of the bill's consumer bankruptcy reforms consists of the implementation of an income/expense screening mechanism ('needs-based bankruptcy relief' or 'means testing'), which

> is intended to ensure that debtors repay creditors the maximum they can afford."
> H.R. Rep. 109-31(I) at 1, *reprinted in* 2005 U.S.C.C.A.N. 88, 89 (April 8, 2005).
> The purpose of the means test is to "help the courts determine who can and who
> cannot repay their debts and, perhaps most importantly, how much they can afford
> to pay." 151 Cong. Rec. S1726-01, S1786 (daily ed. Feb. 28, 2005) (statement of
> Sen. Hatch). Excluding the $4,000 per month in replacement income from CMI
> would result in a figure that does not accurately reflect the Blauseys' ability to
> repay their debts. Congress's determination that a certain type of income should
> not be taxed does not reflect a determination that the income is not available to
> repay debts.

*Blausey*, 552 F.3d at 1133 -1134. By including the proceeds derived from the sale of Debtors' personal, nonbusiness, noninvestment, vehicles within six months of the filing of their bankruptcy case that were used to purchase two new vehicles prior to filing bankruptcy, Debtors would be overstating their income that would be available for plan payments. The proceeds from Debtors' two vehicles are not income for purposes of calculating CMI. Such proceeds are not derived from capital, labor or a combination of both and are not derived from employment, investments, royalties, gifts, and the like. The proceeds are also not replacement income.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction in this Chapter 13 case under 28 U.S.C. § 1334(a).

2. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) involving confirmation of a plan.

3. The Debtors failed their burden of proof to show that the "disposable income" requirement of 11 U.S.C. § 1325(b)(1)(B) has been satisfied after application of §§ 1325(b)(2) and 1325(b)(3) when they included their cost bases at line 60 of their Form B22C.

4. The Debtors are wage earners and had no income from the operation of a business, profession, or farm, and therefore the Ninth Circuit BAP's decision *In re Wiegand*, 386 B.R. 238

(9th Cir. BAP) does not apply.

    5. "Income from all other sources" at line 9 of Form B22C does not include proceeds received from the prepetition sale of Debtors vehicles as such proceeds are not derived from gains, employment, investments, royalties, gifts and the like and are not a replacement for income. *Blausey v. U.S. Trustee*, 552 F.3d 1124 (9th Cir. 2009).

    **IT IS ORDERED** a separate Order shall be entered in conformity with the above sustaining the Chapter 13 Trustee's objection to confirmation in part and overruling it in part. Debtors will be granted time to file an amended Form B22C to remove their cost bases from line 60, to amend their entry at line 9 as well as where otherwise appropriate, and to file an amended Plan.

                                        BY THE COURT

                                        HON. RALPH B. KIRSCHER
                                        U.S. Bankruptcy Judge
                                        United States Bankruptcy Court
                                        District of Montana